The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Stephenson and the briefs and oral arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence of record, the Full Commission reverses the Deputy Commissioner and enters the following Opinion and Award.
***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing and following, and in a Pre-Trial Agreement admitted into evidence as Stipulated Exhibit #1, as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission and the parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. On 9 June 1991 and 26 June 1991, an employment relationship existed between plaintiff-employee and defendant-employer.
3. The plaintiff's stipulated compensation rate on those dates was $304.00 per week.
4. Wellman, Incorporated is self insured with Sedgwick as the servicing agent.
5. Industrial Commission file number 144769 regards plaintiff's compensable injury by accident to his back on 9 June 1991. The parties entered into a Form 21 Agreement on 12 September 1991 with regards to this claim, which was approved by the Commission on 25 September 1991.
6. Industrial Commission file number 150482 regards plaintiff's alleged injury by accident on 26 June 1991 for which compensability is contested.
7. Plaintiff returned to work on 1 April 1992 and continued working through 22 April 1992.
8. Plaintiff is presently receiving Social Security disability benefits in the amount of $1,009.00 per month.
9. Plaintiff's records from E. E. Smith High School are admitted into evidence as Stipulated Exhibit #2.
10. Plaintiff's medical records from Dr. McIllwain are admitted into evidence as Stipulated Exhibit #3.
11. The issues to be determined by hearing are:
 (1) Whether plaintiff suffered a compensable injury by accident on 26 June 1991.
 (2) Whether plaintiff's current medical condition is causally related to the 9 June 1991 or 26 June 1991 injury or a combination thereof.
***********
Based upon all of the competent evidence and reasonable inferences drawn therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. This case is before the Full Commission on defendant's appeal from two decisions of Deputy Commissioner Theresa Stephenson: an Interlocutory Opinion and Award filed 28 April 1997, denying defendant's motions to dismiss; and an Opinion and Award filed 24 February 1998, awarding plaintiff benefits retroactively to April 1992.
2. The procedural history of this case now spans a period of more than seven years. Plaintiff suffered a back injury on 9 June 1991. In I.C. No. 144769, defendant accepted this injury as compensable, and the Commission approved an I.C. Form 21 agreement, providing for compensation for a "back strain," on 25 September 1991. Plaintiff returned to work on 17 June 1991, and on 26 June 1991, while on a break and talking with a co-employee, he fainted and fell to the floor. Although plaintiff would later contend that this incident was connected to his back injury, he filed a separate I.C. Form 18 on 16 July 1991, and the administrative personnel at the Commission assigned it I.C. No. 150482.
3. Plaintiff returned to work again on 1 April 1992, but stopped working after 22 April 1992. A dispute arose as to plaintiff's entitlement to further benefits, and on 22 June 1993, an initial hearing was held before Deputy Commissioner Willis. On 29 September 1993, Deputy Commissioner Willis entered an opinion and Award, finding, among other things, that plaintiff was not entitled to disability benefits after 23 April 1992. No appeal was taken from that decision.
4. In early 1994, after a dispute arose about the payment of some medical expenses, plaintiff sought another hearing. The case was set for hearing, but plaintiff then requested a continuance. By order entered 23 February 1994, former Deputy Commissioner Tamara Nance allowed the continuance over defendant's objection and ordered the case removed from the active hearing docket.
5. For more than two years after the Order of Removal, plaintiff took no action to pursue any remaining claim he might have had. On 5 March 1996, plaintiff filed an I.C. Form 33, claiming that he had been "denied compensation for permanent and total disability." Defendant filed a Form 33R, stating, among other defenses, that plaintiff's claims were barred by resjudicata and failure to timely prosecute his case. On 18 March 1996, defendant filed a Motion to Dismiss. After hearing arguments and receiving evidence, including a medical deposition, Deputy Commissioner Stephenson filed her Interlocutory Opinion and Award on 28 April 1997, denying defendant's motion to dismiss.
6. On 26 August 1997, Deputy Commissioner Stephenson held an evidentiary hearing. After receiving two more medical depositions and written contentions, she filed her Opinion and Award on 24 February 1998. Defendant timely appealed from both the Interlocutory Opinion and Award and the final Opinion and Award.
7. Plaintiff is 47 years old (DOB: 9/1/51) and a high school graduate. Before June 1991, he worked for a number of years as a spinning operator at the Fayetteville facility of the defendant-employer, Wellman, Inc. Wellman produces continuous filament polyester yarn used in clothing.
8. In the job of spinning operator, plaintiff monitored the operations of several spinning machines, including occasional "doffing"(removing filled spools of yarn from the machine). Mechanical lifting devices were used for lifting spools weighing more than 35 pounds.
9. Sometime before 15 April 1991, plaintiff's family doctor, Dr. Aul, sent him for a whole body bone scan, as a result of plaintiff's complaint of back pain. Dr. Aul testified at his deposition that he could not find any note of this referral in his records, and concluded that he may have ordered the bone scan based on just a telephone call from plaintiff. On a 28 May 1991 visit to Dr. Aul, plaintiff gave a history of low back pain present for several years, but worse in the last 5-6 months, with no trauma. Dr. Aul's diagnosis was "arthritis . . . of unclear etiology most likely lumbosacral osteoarthritis with degenerative joint disease." Dr. Aul prescribed Naprosyn and suggested that plaintiff return in six weeks.
10. On 9 June 1991, plaintiff reported to his supervisor that he had felt pain while coming down a ladder, and that later, he bent to pick up something and felt severe back pain. Plaintiff was referred to Dr. James Zinser, and was seen by him on 10 June 1991. Plaintiff told Dr. Zinser that he had been bending over picking up a heavy package and experienced low back pain, with no radiation into his legs. Plaintiff told Dr. Zinser that he had not had any prior problems with his back, and made no mention of his treatment with Dr. Aul several weeks earlier or that he was on prescription medication for back pain before 9 June 1991. Dr. Zinser diagnosed a low back strain and recommended conservative care, including the medications Ansaid and Robaxin. Dr. Zinser also excused plaintiff from work through 18 June 1991 and suggested a return visit in one week.
11. Defendant, without knowledge of plaintiff's prior treatment, did not question the history provided by plaintiff to Dr. Zinser and accepted the 9 June 1991 claim as compensable.
12. Plaintiff returned to Dr. Zinser 17 June 1991 and reported some discomfort in his back, but no pain radiating into his legs. Straight leg raising tests were negative, and Dr. Zinser's assessment was "low back strain, probable sacroiliac strain." Dr. Zinser released plaintiff to return to work on light duty, and recommended that he continue the medication and return in two weeks. Plaintiff returned to work 17 June 1991, and was assigned a light duty job.
13. Plaintiff worked in the light duty position for the next week without any reported problem. On 24 June 1991, plaintiff, on his own and without attempting to return to Dr. Zinser, sought out treatment from Dr. Aul, his family doctor. Plaintiff told Dr. Aul that he was having some discomfort "into the posterior aspect" and that he felt the Ansaid was causing "stomach discomfort." Dr. Aul noted no other purported side effects in his office note of 24 June. Later he wrote that plaintiff had actually stopped taking the medication he had been prescribed on 22 or 23 June 1991 because he felt it caused diarrhea and insomnia. Plaintiff made no report of dizziness or feeling faint. Dr. Aul, without consulting Dr. Zinser, scheduled an MRI for early July, and gave plaintiff a prescription for Lodine and Methocarbamol.
14. On 26 June 1991, plaintiff was working his light duty job and stated he was "feeling pretty good that morning." In the afternoon, plaintiff took a break from his job and he had been standing and talking with a co-worker, Jamie Davis, for 15-20 minutes when he began to feel dizzy and before he could sit down, he fainted. Mr. Davis, the only other person present, saw plaintiff "slide down the wall" and land on the floor on his back. Mr. Davis also reported that after plaintiff fainted, his body "jerked" for several minutes. Donald Simpson, a member of the plant emergency brigade, arrived within 2-3 minutes. He did not observe any such "jerking" motion, nor any bruising or lacerations on plaintiff's head.
15. Plaintiff was immediately taken to Cape Fear Valley Medical Center, where he was seen in the emergency room. The emergency room records indicate no lacerations, bruising, knots, or other signs of injury to the head. The emergency room physician's diagnosis was "syncopal episode" (fainting), and based on the reported jerking motion, the doctor also noted "possible seizure disorder." Plaintiff was released, and instructed to rest and stay out of work for two days. On 28 June 1991, plaintiff returned to the Cape Fear emergency room, complaining of "headache and eyeballs sore and ringing in ears and head tingling." Plaintiff later testified that he had experienced ringing in his ears for years. The emergency room physician found "no acute pathology," and recommended that plaintiff see his family doctor for any further problem.
16. On 1 July 1991, plaintiff returned for a follow up visit with Dr. Zinser, and said that he had had a "seizure" several days ago and had a "brain concussion." As to his back, plaintiff reported continued pain in the lumbosacral area, with no radiation down either leg. Dr. Zinser's diagnosis was continued low back pain with mild degenerative disc disease. He suggested that plaintiff be on light duty for two weeks, and recommended that he see his family physician about the possible seizure disorder.
17. On 3 July 1991, plaintiff returned to the Cape Fear emergency room, and based on reports of confusion and "personality changes," he was admitted to the hospital for a thorough work-up under the supervision of Dr. Barry White, a neurologist. While hospitalized under Dr. White's care, plaintiff underwent a CT scan which showed a "lacunar infarct", which might be indicative of plaintiff having suffered a "light stroke." Dr. White later ordered an MRI of the brain, and it again showed a small lacunar infarct, which Dr. White felt was most likely associated with a "tiny venous angiomall." Dr. White was not certain as to whether plaintiff had suffered a stroke. In explaining his conclusions to plaintiff on 24 June 1991, Dr. White stated that the fainting incident "may or not have been a stroke" and "may have been a fluke" which "may never happen again."
18. While hospitalized under Dr. White's care, plaintiff also underwent a lumbar spine MRI on 15 July 1991, and it showed only a mild bulging disc at L4-L5, with no disc herniation. Dr. White released plaintiff from his care as of 24 July 1991, and recommended that he get into back strengthening exercises, with the goal to return to work in 2-4 weeks.
19. Despite assurances from Dr. White, plaintiff remained convinced that he had suffered a "head injury" and also a stroke. On 15 July 1991, he told his rehabilitation nurse that he was convinced that the stroke was caused by his fall at work. He also told the nurse that "head injuries can be a problem for a long time, and he will make sure he is compensated for his injuries." In contrast to plaintiff's belief, Dr. Aul confirmed that even if plaintiff did strike his head after he fainted, such a blow could not have caused the stroke.
20. Despite Dr. White's recommendation that he proceed with physical therapy and return to work, plaintiff got his family doctor, Dr. Aul, to write a note excusing him from work indefinitely. At plaintiff's request, Dr. Aul also scheduled him to see Dr. Wilkins, a neurosurgeon at Duke University, who had previously performed back surgery on plaintiff's wife. Plaintiff first saw Dr. Wilkins on 15 August 1991, and at that time, he told the doctor he had been "lifting sacks at work on June 9 when he developed low back pain with radiation into both buttocks, left more than right." Dr. Wilkins reviewed the lumbar MRI from 15 July 1991, and agreed that it showed a mild bulge at L4-5, but no herniation. Dr. Wilkins also ordered further testing, including a myelogram and a post-myelogram CT, and those tests showed a disc bulge and mild spinal stenosis.
21. Dr. Wilkins offered plaintiff surgery as an option, telling him that he could think about it and decide later if he wished. Plaintiff, without ever contacting his employer or any of the authorized treating physicians, underwent surgery on the very next day. In his operative note, Dr. Wilkins noted that he removed fragments of degenerating disc material from the L5 area.
22. Plaintiff saw Dr. Wilkins for standard follow up visits after the surgery. When plaintiff complained to Dr. Wilkins of headaches and concerns about the fainting incident, Dr. Wilkins suggested he see Dr. Ara Tourian, a neurologist at Duke. Under Dr. Tourian's supervision, plaintiff underwent another complete neurological evaluation. Dr. Tourian also reviewed the prior testing, which he described as an "extensive work up" done at Cape Fear shortly after the fainting episode. After seeing plaintiff and having further testing done, Dr. Tourian set forth his findings in a letter to plaintiff in which he stated that he was unable to tell why plaintiff fainted and found no neurological abnormalities or any evidence of permanent damage.
23. Plaintiff returned to his family doctor, Dr. Aul, on 30 September 1991. After reporting that he had undergone surgery, plaintiff told Dr. Aul that he was concerned there was a misunderstanding of his complaints on 5/28/91 and states now that he felt his back pain was most likely secondary to gas discomfort and that his leg pain was primarily joint pain or arthralgia. Although he would later contend that he was confused and unable to think clearly during this time, plaintiff had the presence of mind to ask Dr. Aul to change his history of significant back problems before any on-the-job injury on 9 June 1991.
24. Through March 1992, plaintiff continued to see Dr. Wilkins for periodic visits, with improvement in his back symptoms. At Dr. Wilkins' recommendation, plaintiff attended physical therapy and had an FCE done at the conclusion of the physical therapy program which showed that plaintiff was performing at the light/medium physical demand level. Plaintiff missed a number of therapy sessions, citing various reasons for his absences.
25. Plaintiff had negative straight leg raising, and Dr. Wilkins released him to return to work on 1 April 1992 with a lifting limit of 35 pounds. On 11 May 1992, Dr. Wilkins assigned plaintiff a 15% rating to his back.
26. Plaintiff returned to work on 1 April 1992, and was placed in a training program to allow a transition back to his regular job within his restrictions. Plaintiff worked steadily until 22 April 1992, but then did not appear for work for several days. When contacted by the employer, plaintiff said that he had called Dr. Wilkins and had been put on bed rest and medication. When the rehabilitation nurse contacted Dr. Wilkins' office, however, she was told that they had no record of any call or any such action by Dr. Wilkins. The nurse's attempts to then contact plaintiff by telephone went unanswered until 1 May 1992, when he told her he was upset about a death in his family and then hung up.
27. After stopping work, plaintiff went almost one month without seeing any doctor. On 16 May 1992, before returning to the doctor, plaintiff filed an I.C. Form 33, stating in the request that, "I have undergone a substantial worsening of my back condition for which the insurance company and the employer have failed to admit or deny liability and to pay compensation." On 18 May 1992, plaintiff told his family doctor, Dr. Aul, that he had stopped working on 21 April 1992, and complained of back pain.
28. Plaintiff eventually returned to Dr. Wilkins on 25 May 1992, and after a repeat MRI showed nothing except normal post-operative changes, Dr. Wilkins suggested no further active treatment of plaintiff's back. For his additional complaints including reports of swollen knees, neck pain and shoulder pain, Dr. Wilkins suggested that plaintiff see Dr. Tourian for a "multi-modality" evaluation.
29. In July 1992, the employer requested that plaintiff see Dr. James Rice, an orthopaedic surgeon, for an IME, but plaintiff twice failed to appear for scheduled appointments. By order filed 1 September 1992, defendant's Form 24 application, based on plaintiff's refusal to attend the IME, was denied.
30. Plaintiff continued to pursue evaluations at Duke. In July 1992, he had an MMPI personality test, which showed abnormal results for hypochondriasis (excessive concern with bodily functions), depression, hysteria and psychopathic deviate. At Dr. Tourian's suggestion, plaintiff entered the hospital on 4 January 1993 for further testing, including a thorough evaluation of cognitive functioning. Dr. Patrick Logue did the cognitive testing, and he concluded that plaintiff's cognitive ability was completely normal, except for very mild deficits in memory and abstract reasoning, which he felt were attributable to depression. Dr. Logue concluded that, "no further extended neuro-psychological assessment is recommended unless there is some significant change in [plaintiff's] cognition." While in the hospital, plaintiff also reported increasing tension with his wife, as she "did not understand his pain" and thought he should return to work.
31. Based on all of the testing and evaluations, Dr. Tourian concluded that plaintiff's on-going complaints resulted from severe depression. As to what caused the depression, Dr. Tourian later testified as follows: "What I'm saying is, I don't have the information to know why this man was depressed and why did he have back pain problems."
32. The Full Commission finds the plaintiff's testimony regarding his return to work status not to be credible in light of the fact that plaintiff's doctors had released him to return to work. At the hearing before Deputy Commissioner Willis on 22 June 1993 in Fayetteville, plaintiff testified that he felt that he was unable to continue working, claiming that he needed to be in "perfect health" to do his job. On cross-examination, plaintiff acknowledged that he had made no attempt to return to his job since 22 April 1992, and that he had not responded when the employer had again offered him a job in March 1993. Plaintiff admitted that he had been released to return to work by several doctors including Dr. Wilkins and Dr. Kenneth Rich, who plaintiff saw for an IME after being ordered to do so by the Commission. Finally, when asked about the 26 June 1991 fainting incident and his subsequent treatment with Dr. Tourian, plaintiff acknowledged seeing Dr. Tourian in `91 of his own volition and stated, "That claim was denied and really wasn't a work-related accident."
33. At the hearing before Deputy Commissioner Willis, Willie Bethea, Employee Relations Superintendent at Wellman, testified about the company's efforts to assist plaintiff in returning to work, and described plaintiff's job, including narrating a videotape which showed the job duties being performed. Mr. Bethea confirmed that the job required lifting of no more 35 pounds, and that any lifting heavier than that would be done by mechanical assist.
34. The Full Commission finds that plaintiff's contention that his requests to put on medical evidence were refused is not credible. The record of the hearing with Deputy Commissioner Willis contains several statements by the Deputy Commissioner of his willingness to re-set the case for medical evidence to be received if either party desired to do so. Deputy Commissioner Willis left the record open until early September 1993, and at plaintiff's request, he received into evidence a letter from Dr. Tourian dated 23 August 1993 containing responses to plaintiff's written questions. Plaintiff chose to submit his medical evidence in written form, and he never requested that the case be re-set to take any of the doctors' testimony.
35. In August 1994, Dr. Aul, responding to an inquiry from a Ms. Comer with Claims Service International related to a private disability claim, said that plaintiff could "perform the job duties" as described in four job descriptions which she had sent the doctor. While expressing some concern that returning to work might cause plaintiff's back pain to increase, Dr. Aul concluded, "I do feel he is capable of performing these job duties."
36. From late 1994 forward, the only medical treatment plaintiff has received is periodic monitoring by Dr. Aul and Dr. McIllwain. Those doctors' records reflect that while plaintiff has periodically reported "ups and downs" in his complaints, his physical exam has been generally normal, and his depression has been stable with medication.
***********
Based upon the findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff's claim for additional benefits based on the alleged disability arising from his initial back injury is barred by res judicata where the alleged disability was in existence at the time of the 22 June 1993 hearing before the Deputy Commissioner. Stanley v. Gore Brothers,82 N.C. App. 511, 516, 347 S.E.2d 49 (1986); Thomas M. McInnis Assoc., Inc. v. Hall, 318 N.C. 421, 427, 349 S.E.2d 552, 556
(1986); State v. Lewis, 63 N.C. App. 98, 102,303 S.E.2d 627, 630 (1983), aff'd, 311 N.C. 727, 319 S.E.2d 145
(1984).
2. Even if res judicata were not applicable in this case, plaintiff has failed to prove by the greater weight of the evidence that his alleged injury from fainting on or about 26 June 1991 and the combined psychological problems are a direct result of an accident or specific traumatic incident arising out of and in the course of his employment with defendant. N.C. Gen. Stat. § 97-2(6).
3. Plaintiff has failed to prove by the greater weight of the evidence that the fainting incident on 26 June 1991 resulted naturally and unavoidably from the 9 June 1991 back injury or the medication prescribed for that back injury. N.C. Gen. Stat. §97-2(6).
***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. The decisions of Deputy Commissioner Stephenson are hereby reversed.
2. Plaintiff's claim for additional benefits is hereby DENIED.
3. Defendant shall pay an expert witness fee to Dr. Ara Tourian in the amount of $812.50 if defendant has not already done so.
4. The parties shall pay their own costs.
This 27th day of May 1999.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/_____________ RENEE C. RIGGSBEE COMMISSIONER
Commissioner Christopher Scott, who was a member of the Full Commission panel which reviewed this case, was unavailable at the time of the filing of this Opinion and Award because of illness.
CHRISTOPHER SCOTT COMMISSIONER